IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GREAT AMERICAN ALLIANCE
INSURANCE CO.,

No. 3:18-CV-00908-HZ

        Plaintiff,

OPINION & ORDER

    v.

SIR COLUMBIA KNOLL ASSOCIATES
LIMITED PARTNERSHIP,

        Defendant.
_____

SIR COLUMBIA KNOLL ASSOCIATES
LIMITED PARTNERSHIP,

        Third-Party Plaintiff,

    v.

PHILADELPHIA INDEMNITY INSURANCE CO.,

        Third-Party Defendant.
_____

HERNÁNDEZ, District Judge:

In this action, the parties dispute insurance coverage for water-damaged apartment buildings. Four motions are before the Court: (1) Plaintiff Great American Alliance Insurance Co. ("GAIC")'s motion for summary judgment; (2) Third-Party Defendant Philadelphia Indemnity Insurance Co. ("Philadelphia")'s motion for summary judgment; (3) GAIC and Philadelphia's joint motion to exclude; and (4) Defendant and Third-Party Plaintiff SIR Columbia Knoll Associates Limited Partnership ("Columbia Knoll")'s motion to strike. For the reasons that follow, the motions for summary judgment are granted in part and denied in part. The motion to exclude is granted in part and denied in part. The motion to strike is denied.

## BACKGROUND[1]

Defendant Columbia Knoll owns and manages the apartment buildings at issue, which are adjacent complexes in northeast Portland: The Terrace at Columbia Knoll, which contains 118 income-restricted apartments in nine separate buildings, and The Heights at Columbia Knoll Senior Residence, which contains 208 income-restricted apartments in one four-story building.

Construction on both The Terrace and The Heights began in 2005. Houser Decl. Ex. T at 2–3, ECF 88. Water intrusion began immediately due to defects in this construction. *Id.* at 8. In 2010 and 2011, after damage from this water intrusion was discovered, repairs were performed. *Id.* at 8; Houser Decl. RR at 10.

Between 2011 and 2017, GAIC and Philadelphia (collectively, "the insurers") issued property insurance policies to Evergreen Portfolio, LLLP.[2] GAIC's policies were effective from June 30, 2011 through June 30, 2014. Philadelphia's policies were effective from June 30, 2014

---

[1] Unless otherwise noted, the following facts are taken from this Court's September 6, 2019 Amended Opinion & Order, ECF 80.
[2] LLLP is an abbreviation for Limited Liability Limited Partnership. Evergreen Portfolio is not a party to this action.

through June 20, 2019. The policies were negotiated and purchased through an insurance brokerage.

In September 2016, Columbia Knoll brought a lawsuit in Multnomah County Circuit Court against a general contractor and two subcontractors, alleging that the defendants' faulty workmanship on the property and violations of Oregon building codes had allowed water intrusion, causing extensive damage to the buildings. In its Multnomah County complaint, Columbia Knoll sought $8 million in damages. In October 2016, Columbia Knoll reported the loss to its insurance broker, which then reported the loss to GAIC. The loss notice described the loss as "recently discovered water damage at 2 properties."

In April 2018, Columbia Knoll sent Great American a proof of loss statement, estimating the cost of repairs to the property at more than $14 million. Great American denied Columbia Knoll's claim.

In May 2018, GAIC filed its complaint in this action, seeking declaratory relief. In July 2018, Columbia Knoll filed its answer, asserting counterclaims against GAIC for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Washington Consumer Protection Act. Columbia Knoll also sought coverage under Philadelphia's policies. In September 2018, after Philadelphia denied coverage, Columbia Knoll filed a third-party complaint against Philadelphia, asserting the claims it asserts as counterclaims against GAIC.

In a September 6, 2019 Opinion & Order, the Court ruled that Oregon law applies to the dispute and dismissed Columbia Knoll's claims for violations of the Washington Consumer Protection Act and for tortious breach of the implied covenant of good faith and fair dealing. The Court now turns to the pending motions to strike, to exclude, and for summary judgment.

## I.      Motion to Strike

Columbia Knoll moves to strike the Declaration of Jaqueline Mitchson, offered in support of GAIC and Philadelphia's joint motion to exclude the expert opinion testimony of Felix Martin and Matthew Anderson. In this declaration, Ms. Mitchson reports the contents of telephone call with Dr. Morell, the author of *Predicting the Rate of Decay, and the Potential for Misinterpretation of Proper Scientific Method* and a former professor of Columbia Knoll's expert Matthew Anderson. Columbia Knoll argues the Court should strike the declaration because it (1) contains hearsay and (2) "apparently falsely relays" the contents of the telephone call. Mot. Strike at 2, ECF 109.

First, regarding the issue of hearsay, Ms. Mitchson's declaration was submitted in support of a motion to exclude expert testimony. The rules of evidence do not apply to "any preliminary question about whether a witness is qualified." Fed. R. Evid. 104. Even Columbia Knoll concedes that "the hearsay rule is not mandatory under Rule 104 for this decision." Reply Strike 2, ECF 115. The Court therefore declines to strike the declaration on these grounds.

Second, regarding the alleged inaccuracies, Columbia Knoll provides no support for its position that such inaccuracies provide a basis to strike. Columbia Knoll does not argue the declaration is a "sham" or inconsistent with the declarant's own previous statements. Instead, Columbia Knoll simply argues the declaration is contradicted by other evidence in the record. This is a question of fact going to the weight of the evidence; it is not properly resolved at this time. The Court therefore denies Columbia Knoll's motion to strike [109].

//

//

//

II.      **Motion to Exclude Testimony**

a.  **Standards**

Federal Rule of Evidence 702 gives the trial court discretion to allow expert testimony

that "will help the trier of fact to understand the evidence or to determine a fact in issue" if (1) it

is "based upon sufficient facts or data," (2) it is "the product of reliable principles and methods,"

and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed.

R. Evid. 702. "Broadly speaking, expert opinion is admissible if the expert is qualified and the

expert's testimony is both reliable and relevant." *Cramblett v. McHugh*, No. 3:10-CV-54-PK,

2012 WL 7681280, at *1 (D. Or. Nov. 19, 2012) (citing *Daubert v. Merrell Dow Pharms., Inc.*,

509 U.S. 579, 589 (1993) (additional citation omitted).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid

connection to the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044

(9th Cir. 2014) (citation and quotation marks omitted); *see also Estate of Barabin v.*

*AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) ("Relevancy simply requires that [t]he

evidence . . . logically advance a material aspect of the party's case.") (citation and quotation

marks omitted) (alterations in original).

Expert testimony "is reliable if the knowledge underlying it has a reliable basis in the

knowledge and experience of the relevant discipline." *City of Pomona*, 750 F.3d at 1044 (citation

and quotation marks omitted). The inquiry into reliability is "a flexible one," and the district

court has "broad latitude" in shaping its contours. *Estate of Barabin*, 740 F.3d at 463. "The

Supreme Court has suggested several factors that can be used to determine the reliability of

expert testimony: 1) whether a theory or technique can be tested; 2) whether it has been

subjected to peer review and publication; 3) the known or potential error rate of the theory or

technique; and 4) whether the theory or technique enjoys general acceptance within the relevant

scientific community." *Id.* (quotation marks and citations omitted).

"In evaluating proffered expert testimony, the trial court is a gatekeeper, not a fact

finder." *City of Pomona*, 750 F.3d at 1043–44 (citation and quotation marks omitted). "The test

is not the correctness of the expert's conclusions but the soundness of his methodology, and

when an expert meets the threshold established by Rule 702, the expert may testify and the fact

finder decides how much weight to give that testimony." *Id.* at 1044 (citation and quotation

marks omitted). Challenges to the weight of the evidence and the expert's credibility are for a

jury, not a trial judge, to evaluate. *Id.*

### b. Discussion

Philadelphia and GAIC jointly move to exclude the testimony of two expert witnesses:

Felix Martin and Matthew Anderson.

### i. Felix Martin

Felix Martin is an engineering expert. Briefly, Martin opines that, based on evidence of

damage to structural components at exterior walls and balconies, a policy-covered collapse

occurred at the buildings at issue. The insurers argue that Martin's opinion must be excluded to

the extent it (1) relies on the wrong definition of collapse and (2) speaks to unseen and untested

areas of the buildings.

### 1. Collapse[3]

Both the GAIC and Philadelphia policies provide coverage for "direct physical loss or

damage to covered property, caused by abrupt collapse of a building or any part of a building"

insured under the policy. Houser Decl. Ex. A at 10 ("GAIC Policy"), ECF 88; Kirby Decl. Ex. A

---

[3] In addition to their briefing on the motion to exclude, the parties raise arguments regarding the
term collapse in their summary judgment briefing. Because the term is central to the relevancy of
Martin's opinion, the Court addresses those arguments here as well.

at 54 ("Phil. Policy"), ECF 31. A collapse is defined as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." *Id.*

> In his report, however, Martin opines that a "structural collapse" occurs
>
> when a building's (or a building portion's) structural support system has, due to a loss of strength, or through excessive deflection or deformation, reached a state of structural instability and ceased to provide its intended structural support purpose.

Hill Decl. Ex. A at 4, ECF 100 ("Martin Report"). The question is therefore whether Martin's definition of "structural collapse" is inconsistent with the policies' definition of "collapse."

The parties appear to agree that *Malbco Holdings, LLC v. AMCO Ins. Co.* provides the controlling interpretation of the term "collapse."[4] In *Malbco*, a hotel brought suit against its insurer after the insurer denied coverage. 629 F.Supp.2d 1185, 1188 (D. Or. 2009). The hotel alleged that a collapse occurred when several trusses deteriorated, causing parts of the hotel to fall more than three inches. *Id.* at 1191. The court examined the policy's definition of collapse— "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of a building cannot be occupied for its intended purpose"—to determine whether the damage was covered by the policy's "collapse" provision. *Id.* at 1193. The court found that while "the word 'abrupt' has a plain meaning,[5] namely sudden[,] . . . the remainder of

---

[4] To the extent Columbia Knoll also relies on *Richardson v. Travelers Prop. Cas. Ins. Co.*, CIV 03-1185-HA, 2004 WL 1173186 (D. Or. May 25, 2004) and *Schray v. Fireman's Fund Ins. Co.*, 402 F. Supp. 2d 1212 (D. Or. 2005), these cases were published before *Hennessy v. Mutual of Enumclaw Ins. Co.*, 228 Or. App. 186 (2009) and interpret policies that did not define the term collapse.

[5] Columbia Knoll also argues, in response to Philadelphia's motion for summary judgment, that the term "abrupt" is ambiguous. First, Columbia Knoll argues that because the policies cover a collapse caused by hidden decay, abrupt must necessarily include "the gradual loss of strength of building components;" "[d]ecay, after all, cannot impair the structural integrity of a building in a short amount of time." Resp. to Phil. Mot. Summary Judgment 13 ("Resp. to Phil."), ECF 91. Columbia Knoll's argument again relies on Martin's erroneous definition of the term collapse. It also ignores the fact that the policies require the *collapse* be abrupt; they do not require the

the definition was subject to more than one plausible interpretation" and was therefore

ambiguous. *Id.* at 1195. Specifically, the question was whether a collapse occurs "only when a

building (or part of it) completely falls down or caves in and is no longer standing," or whether

the occupancy requirement "means that something less than completely falling to the ground

qualifies as collapse." *Id.* The court concluded that

> [t]he Policy is not written in terms of how far a building must fall down or to what
> degree a building must cave in to constitute collapse. Clearly one cannot occupy a
> building if it has completely fallen down or caved in. However, the same may be
> true for a building which has partially fallen down or caved in. It is far from clear
> that the Policy requires total destruction in order for a collapse to occur. Instead,
> the occupancy restriction stands as a proxy for a substantial impairment of
> integrity by adding a life and/or safety element to the definition. *If parts of a
> building abruptly fall or cave in to any degree such that they cannot be occupied
> for their intended purposes . . . , then a collapse has occurred.*

*Id.* at 1196 (emphasis added). Thus, the court found that because the plaintiff claimed that

"trusses broke and portions of the building fell a few inches," it had alleged a collapse under the

terms of the policy. *Id.*

Columbia Knoll argues that, under *Malbco*, a collapse requires only a "substantial

impairment to the structural integrity" of the building. Resp. to Phil. Mot. Summary Judgment 11

("Resp. to Phil."), ECF 91. The Court does not agree; Columbia Knoll's interpretation simply—

and impermissibly—ignores one part of the policy definition altogether. As explained above, the

---

condition leading to—or causing—the collapse be abrupt. Second, Columbia Knoll relies on a
pollution case in which the court found that while "sudden" could mean "abrupt" (with a
temporal element), it could also mean "unexpected." *See St. Paul Fire & Marine Ins. Co., Inc. v.
McCormick & Baxter Creosoting Co.*, 324 Or. 184 (1996). *St. Paul Fire* does not support the
argument that *abrupt* does not have a temporal element. Rather, by inference, it suggests the
opposite. Moreover, courts in this district have found that "sudden," in the context of a collapse
clause, *does* contain a temporal element. *Ass'n of Unit Owners of Nestani v. State Farm Fire &
Cas. Co.*, 670 F. Supp. 2d 1156, 1163 (D. Or. 2009) ("I thus interpret 'sudden' in this context to
mean 'marked by or manifesting abruptness or haste' or 'made or brought about in a short period
of time.'"). Finally, even if the term were ambiguous, construing the term to mean "unexpected"
would not impact the outcome of this case; as discussed below, Martin's definition of "collapse"
still excludes reference to any falling down or caving in.

*Malbco* court found that the *occupancy restriction* ("with the result that the building or part of a building cannot be occupied for its intended purpose") stood as proxy for a substantial impairment of structural integrity. The Court sees *no* support for Columbia Knoll's position that the "'falling down or caving in' language . . . is a 'proxy' for the long-established rule that 'collapse' may be interpreted . . . in favor of coverage to require only 'substantial impairment to the structural integrity' of the insured's building." *Id.* Rather, collapse, as defined by these policies and the *Malbco* court, requires, in relevant part, a showing that the building (1) abruptly fell down or caved in (2) such that it could not be occupied for its intended purpose.

Although somewhat unclear, Columbia Knoll also appears to argue that, because the policies do not specify how *far* a building must fall down or cave in, the provision is ambiguous and should be stricken. The argument is without merit. First, the parties do not contest that the policies require, at a minimum, an "abrupt falling down or caving in." As a general matter, Oregon courts do not construe contracts in a manner that renders provisions meaningless. *Thomas Creek Lumber & Log Co. v. State Forester*, 157 Or. App. 204, 213 (1998). Striking or ignoring a provision renders it meaningless. *Malbco*, 629 F.Supp.2d at 1196.

Second, the Oregon Court of Appeals' analysis in *Hennessy* provides persuasive guidance on this very issue. In *Hennessy*, the court reviewed the undefined term "collapse." *Hennessy v. Mutual of Enumclaw Ins. Co.*, 228 Or. App. 186 (2009). Consistent with the definition at issue here, the court found that "'[c]ollapsing' is a verb, whose root means, among other things, 'to break down completely,' 'to fall or shrink together abruptly and completely,' and 'to cave in, fall in, or give way : undergo ruin or destruction by falling or as if by falling down.'" *Id.* at 193 (citing *Webster's Third New Int'l Dictionary* 443 (unabridged ed. 2002)). The court went on to conclude that both falling down and caving in did not require a "total or complete fall." *Id.*

"Rather, they require only that an object, acting under the force of gravity, descend or drop involuntarily. Thus, although 'collapse' refers to a situation where an object, acting under the force of gravity, descends or drops, it is not clear that the definition requires a total or complete descent." *Id.* In sum, "*'collapse' requires only that an object fall some distance*." *Id.* (emphasis added)*.* This is consistent with the *Malbco* court's conclusion that "[i]f parts of a building abruptly fall or cave in *to any degree* such that they cannot be occupied for their intended purposes . . . , then a collapse has occurred. 629 F.Supp.2d at 1196 (emphasis added).

Notably, although Columbia Knoll argues that the phrase "falling down or caving in" is ambiguous, Columbia Knoll does not provide any alternative construction. Instead, it simply argues the phrase should be construed against the insurers. In its discussion of *Hennessy*, however, Columbia Knoll acknowledges that the insured's failure to offer an alternative construction was fatal to its argument. *See* Resp. to Phil. 15 ("The manifest failure of the insured in *Hennessy* to offer its own interpretation of 'collapse'—never mind a reasonable one— necessarily meant that the insured would lose its case."). Here, too, with no alternative definition or argument, the Court cannot "construe" the phrase in Columbia Knoll's favor by simply striking it from the policies altogether.

In sum, the Court follows *Malbco* and *Hennessy* to find that, under the terms of the policies at issue, a collapse occurs when parts of a building abruptly fall or cave in to any degree such that they cannot be occupied for their intended purposes. Thus, to the extent Martin's opinion relies on his "substantial impairment" definition of collapse, the opinion is irrelevant and will be excluded.

//

//

10 – OPINION & ORDER

## 2.    "Unseen and Untested Areas"

The insurers argue that Martin also offers opinions about unseen and untested areas of the buildings, and these opinions should be excluded as "pure speculation." Mot. Exclude 13, ECF 84. According to the insurers, Martin assumes building-wide conditions based on an examination of "very limited portions of the building," and his conclusions are not reliable because he did not perform strength testing and relied on Anderson's unreliable decay estimates. *Id.*[6]

The Court finds the insurers' arguments unpersuasive at this time. The insurers offer no legal citation to support their position. Instead, they cite, without sufficient argument, a single paragraph from the declaration of expert Dr. Donald Bender. Bender does not explain *why* Martin's position is impermissibly speculative or *why* it was improper for Martin to extrapolate "from the observed damages that similar, additional damages afflict the rest of the buildings." *See* Resp. Mot. Exclude 8, ECF 97. Moreover, the insurers do not appear to challenge the reliability of Anderson's strength testing, but rather the reliability of his decay estimates. *See* Mot. Exclude 13 ("The conclusion even for the limited components he reviewed is not sufficiently reliable because he did not perform any strength testing and he relied on the decay estimates of Anderson which are not scientifically reliable.")[7] It is not clear, however, that Martin's challenged opinions rely on Anderson's decay estimates at all. Without further explanation or argument, the Court cannot find that Martin's opinions on this issue are impermissible. To the contrary, the Court sees only an undeveloped dispute between experts and reminds the parties that challenges to the weight of the evidence and the expert's credibility are left for the finder of fact.

---

[6] The insurers also argue that there is no evidence of large-scale water intrusion. Neither the insurers nor Bender explain the significance of this argument.

[7] To the extent Bender's three-sentence critique of Anderson's methods can be read to challenge the reliability of Anderson's strength testing, the argument is not raised or developed by counsel.

### ii.  Matthew Anderson

Matthew E. Anderson is a consulting wood scientist. The insurers argue that Anderson

applies the wrong definition of collapse and that his opinions and conclusions about historical,

progressive wood decay are not reliable. For the reasons stated above, to the extent Anderson's

opinion relies on Martin's definition of collapse, the opinion is irrelevant and therefore excluded.

The question of reliability is, however, more complicated.

In broad terms, Anderson attempts to calculate the past rate of decay by using data about

the present amount of decay. According to Columbia Knoll, Anderson used resistograph testing

to determine the "resistance strength of the wood" and a microscope to determine the "existence

and extent of 'wood decay hyphae' and 'cellular degradation.'" Resp. Mot. Exclude 10 (citing

Hill Decl. Ex. C at 3–5 ("Anderson Report")). After determining the current degree of decay and

degradation, Anderson applied certain "well-known and peer-reviewed scientific papers and

principles to estimate the 'lag' between the onset of moisture intrusion in 2005 and the onset of

decay." *Id.* Thus, according to Columbia Knoll, Anderson "is simply taking the known loss of

wood, which necessarily is affected by all the factors in a given 'microclimate,' and drawing a

relatively linear rate of decay backwards in time from there." *Id.* at 17. Moreover, he is not

attempting to define a specific time when the wood decay began, but estimating that decay,

based on known "site-specific" conditions, "could not have been present at a given time, or

occurred after a given time." *Id.* at 18.

The insurers take issue with the second half of this analysis. In particular, the insurers

argue that while "well-known and peer-reviewed scientific papers and principles" may be used to

predict *future* rates of decay, they should not be used estimate historical wood decay. In other

words, "Anderson applies the information and conclusions from [these] peer reviewed papers differently than the authors of those papers intended and in a manner that has not been peer reviewed." Reply Mot. Exclude 7.

Columbia Knoll argues that (1) Anderson has significant experience, (2) the identified criticism is not valid because "Anderson's opinions are based on a backward-looking assessment of the damages he observed in March 2019, not a forward-looking prediction" and (3) the methodology in Manual 4 and the Scheffer index are tested and subject to peer review. Resp. Mot. Exclude 15. Columbia Knoll's focus on the semantics of "prediction" are unpersuasive and do not speak to the valid issues discussed below.[8] Moreover, Anderson's experience and the validity of the methodologies set forth in Manual 4 and the Scheffer index are not in dispute. The question is whether Anderson's novel *application* of those methodologies satisfies the *Daubert* requirements. The Court finds that it does not.

First, Columbia Knoll concedes that Anderson's application of these methodologies has not been tested for proof of accuracy and there is no known or potential error rate. There is also no evidence that Anderson's application of these methodologies has been subject to peer review. Accordingly, no controlling standards exist.

Second, Columbia Knoll fails to persuasively respond to the insurers' evidence that "retroactive predictions of when decay occurred are impossible and an inaccurate use of science." *See* Reply Mot. Exclude 8. The insurers' expert Bender opines that "[s]ervice life models, such as the Australian model,[9] were developed as forward-looking prediction tools to estimate durability of populations of buildings on a regional scale. They are not intended, nor are

---

[8] The Court also notes that peer reviewed papers use the term "predict" to reference the same historical decay estimates. *See, e.g.*, Bender Decl. Ex. E at 3–4 (Drs. Morrell and Goodell write that "detailed information on these factors would be needed to attempt to assess rates of decay in specific wooden members, even if the prediction only goes back weeks or months.").
[9] The Australian service life model is described in Manual 4. Bender Decl. ¶ 6.

they appropriate, for backdating decay in a specific building." Bender Decl. ¶ 6, ECF 83. Bender,

in turn, points the Court to published criticism from experts in the field. For example, in the

paper *Predicting the Rate of Decay, and the Potential for Misinterpretation of Proper Scientific

Method*, Drs. Goodell and Morrell write that decay models "have been erroneously used to assess

the initiation and progression of decay in individual structures or even specific wood members

with insufficient prior knowledge of conditions over the entire progression of decay. Service life

models do not account for issues such as the quality of construction in a specific structure, or

whether maintenance was done to repair leaking gutters or flashing." Bender Decl. ¶ 11; Bender

Decl. Ex. E at 3–4. In the paper *Deterioration of Wood Structures – Basic Forensic

Considerations*, Ronald Anthony writes that

> [r]ecently, there have been attempts to take the Australian service life prediction
> model and apply it to forensic investigations to extrapolate the time at which
> decay began in a wood component or material. While the usefulness of such
> information, if it could be generated, is not in question, there is no accepted
> scientific method extant today that can pinpoint the time at which decay starts.
> The Australian service life model and other predictive models provide data for
> general assumptions on wood performance and life expectancy based on a number
> of assumed conditions and variables. They do not have the sensitivity to be
> applied in a retroactive manner to specific instances of decay.

Bender Decl. Ex. A at 5. In sum, "[t]he validity of using the Australian service-life model, or any

service-life model, to work backwards to determine when the onset of decay occurred is not an

accepted scientific practice." *Id.* at 6.

Columbia Knoll does not cite any external support for the reliability of Anderson's

application. Instead, it relies solely on attorney argument and Anderson's own deposition

testimony. Both are conclusory and unpersuasive. For example, Columbia Knoll argues that

Anderson gives "estimates" rather than precise dates. It does not explain, however, *why* this is

relevant to any particular criticism. Even if it were relevant, Anderson still provides no error rate

for these "estimates." With no error rate or confidence interval, the Court cannot determine how relevant or useful these estimates actually are.

Columbia Knoll also focuses on Anthony's criticism. According to Columbia Knoll, Anthony criticizes the "Australian model" because "'all of the variables that go into the equations that are used to predict service life are based on assumptions about general conditions' that 'vary by individual site and site-specific micro-climatic conditions.'" Resp. Mot. Exclude 15. Columbia Knoll argues that Anderson did, however, account for all relevant "site-specific" conditions. Specifically, he tested wood samples from the sites themselves. These samples were "necessarily affected by the 'micro-climate' at those sites," and therefore account for the missing variables. *Id.*

Again, the argument is not persuasive. First, Columbia Knoll fails to explain why or how this accounting of variables is relevant to Anthony's conclusion that *the models themselves* "do not have the sensitivity to be applied in a retroactive manner to specific instances of decay." Bender Decl. Ex. A at 5. Second, Columbia Knoll again relies solely on attorney argument and Anderson's deposition testimony to support its position that Anderson accounted for all relevant micro-climate variables by examining the damage at a certain point in time. *See* Resp. Mot. Exclude 16 ("A: I couldn't predict [the decay] out into the future, but all of these factors are what we were talking about earlier that could exist at a particular location over time causing damage, and then the resulting damage that you see at the time of testing, represents all of these variables. That's all I'm saying.") (citing Clifford Decl. Ex. 10 at 112:5-11, ECF 98). The Court notes, however, that Anthony's article provides "a partial list of factors that can affect the rate of decay," including: "wood species and product type, *moisture content at the time of installation and during service life*, construction details, *moisture intrusion events*, *structure maintenance,*

15 – OPINION & ORDER

*structure modifications and history,* and moisture, temperature and air-flow micro

environments." Bender Decl. Ex A at 5 (emphasis added). In criticizing the use of service models

to "assess the initiation and progression of decay," Drs. Goodell and Morrell also note a lack of

"prior knowledge of conditions over the *entire progression of decay*." Bender Decl. Ex. E at 3.

For example,

> [s]ervice life models do not account for issues such as the quality of construction
> in a specific structure, or whether maintenance was done to repair leaking gutters
> or flashing. Nor do they address issues about whether a given design feature in a
> specific structure increased the risk of fungal decay, what decay type or fungal
> species was involved, whether insect attack or another biological deterioration
> event occurred, or numerous other factors that affect decay processes at a point
> 10, 20, 30 or more years before the damage was detected in the structure.

*Id.* at 3–4. The Court sees no argument from Columbia Knoll about the relevance of these

variables or how Anderson may have accounted for them. In other words, the Court sees no

support—besides Anderson's own conclusory deposition testimony—for Columbia Knoll's

position that Anderson accounted for all relevant variables by simply testing wood samples after

the damage was discovered.

Lastly, the Court again notes that Columbia Knoll fails to address Dr. Goodell, Dr.

Morrell, and Dr. Bender's criticism altogether. As Bender summarizes,

> Goodell and Morrell reference forensic "experts" misusing research to make
> decay timing predictions that would shock the original authors. They discuss
> cases in which a forensic expert made plots of wood decay from as little as two
> presumed data points. They continue: "The first data point is the time of building
> construction, which would be assessed as time zero for the initiation of decay.
> The second data point is the amount of decay present in a small number of
> building structural members, assessed when the structure was opened up during
> inspection years or decades after the building was constructed." Goodell and
> Morrell conclude by stating: "To say that such methodology is lacking in validity,
> vastly understates the problem." Exhibit E, p. 5. Goodell and Morrell published
> this paper in 2013, but *it appears that they are exactly describing Mr. Anderson's
> analysis with respect to the Columbia Knoll buildings*.

Bender Decl. ¶ 11 (emphasis added). Given the issues discussed above, and the fact that Columbia Knoll provides no argument or additional evidence to address these points, the Court cannot find that Columbia Knoll has demonstrated that Anderson's method of predicting past decay is a reliable application of the methodologies at issue. This testimony is therefore excluded.

### III.    Motions for Summary Judgment

Before the Court are GAIC and Philadelphia's motions for summary judgment.

#### a.  Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the Court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### b.  GAIC's Motion for Summary Judgment

"In disputes involving insurance policies, the insured has the initial burden of establishing conditions of coverage, the insurer has the burden of proving that the policy excludes coverage, and the burden to show an exception to an exclusion falls back upon the insured." *Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Co*., 670 F. Supp. 2d 1156, 1159 (D. Or. 2009) (citing *Emps. Ins. of Wausau v. Tektronix, Inc.*, 211 Or. App. 485, 509–14 (2007).

GAIC raises five primary arguments in its motion for summary judgment: (1) Columbia Knoll cannot show that damage "commenced" during the policy period at issue; (2) coverage is barred because Columbia Knoll failed to provide prompt notice of any loss or damage; (3) coverage is barred by the policy's two-year statute of limitations; (4) the special "Cause of Loss" exclusions form was included in the first issued policy; and (5) policy exclusions bar recovery for all damage.

### i.  "Commenced"

The GAIC policy provides:

1. We cover loss or damage commencing:

     a. During the policy period [6/30/2011 to 6/30/2014].

GAIC Policy at 34. GAIC argues that Columbia Knoll cannot meet its burden to establish that its claimed losses commenced within a GAIC policy coverage period.

The parties do not appear to dispute the meaning of the term "commencing." Both parties rely on *Ass'n of Unit Owners of Nestani.* In that case, Judge Aiken found that the term "'commencing' may be reasonably read to include each identifiable instance of collapse, regardless of whether similar loss occurred prior to the Policy period." 670 F. Supp. 2d at 1160.

GAIC argues that Columbia Knoll fails to identify any specific, identifiable instances of collapse or damage due to water intrusion during the policy period. Instead, Columbia Knoll's expert, Felix Martin, "erroneously lump[s] together both the GAIC policy periods of 6/30/2011 to 6/30/2014, with the Philadelphia policy periods of 6/30/2014 to 6/30/2016." GAIC Second Mot. Summary Judgment at 8, ECF 87 ("GAIC Mot.").[10] Thus, the Court understands GAIC to argue that Columbia Knoll's attempt to attribute any specific damage to the covered policy period is speculative at best.

The Court agrees that Columbia Knoll has failed to offer any evidence of a covered collapse. As discussed above, to the extent Columbia Knoll's experts rely on Martin's definition of collapse, the testimony is excluded. Even with this testimony, however, Columbia Knoll has failed to identify any specific, identifiable instance of collapse, as defined by policy, that occurred during the GAIC policy period. Summary judgment is therefore warranted.

As to the non-collapse damages,[11] however, the Court finds that summary judgment is not appropriate. GAIC argues only that Columbia Knoll has failed to identify specific instances of damage due to water intrusion during the relevant policy period. The experts appear to agree,

---

[10] Without legal argument or explanation as to relevance, GAIC also points to evidence that Columbia Knoll discovered damage due to water intrusion in 2010.
[11] According to Columbia Knoll, these damages include "staining, deterioration, and other water-intrusion damage." Resp. to GAIC 6.

however, that water intrusion and damage has been "ongoing" since 2005. *See* Houser Decl. Ex. RR at 5 ("Bender Report") ("Moisture intrusion in the Columbia Knoll buildings was caused by faulty construction, repairs, workmanship and maintenance. The moisture intrusion and associated damage commenced immediately after construction in 2005-2006 and has continued to the present."); Clifford Decl. Ex. 5 at 58:9-12, ECF 92 (Q: "Is there any year that you can testify to where there were no damages after 2005 from moisture intrusion?" A: "No."); Martin Report at 8 ("The damage observed by Bear, Marcon, and WSC was all caused by water intrusion. This water intrusion began immediately after completion of construction in 2005[.]"). In 2010, Columbia Knoll repaired exterior walls damaged by ongoing water intrusion. In 2016, Columbia Knoll alleges it discovered additional damage. Reports from 2018 document the extent of this damage. Given the "ongoing" nature of water intrusion, and the documented history of ongoing damage from this water intrusion, the Court finds it reasonable to infer that specific instances of damage commenced during the relevant periods of coverage. Summary judgment as to these damages is therefore denied.

### ii. Late Notice

The GAIC policy provides:

3. Duties in The Event of Loss or Damage

   a. You must see that the following are done in the event of loss or damage to covered property:

   . . . .

   (2) Give us prompt notice of the loss or damage. Include a description of the property involved.

   (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

GAIC Policy at 29–30. GAIC argues that Columbia Knoll failed to provide prompt notice of any loss or damage, and its claims are therefore barred.

"Under Oregon law an insurer may deny coverage on the basis of an insured's failure to give timely notice of the claim if the insurer satisfies a two-part inquiry regarding prejudice and reasonableness." *Smagala v. Sequoia Ins. Co.*, 969 F.Supp.2d 1271, 1282 (D. Or. 2013). The first question is whether the insurer was prejudiced by the insured's conduct. *Id.* The second question is whether the insured acted reasonably. *Id.* Prejudice may be shown if the insurer did not receive the notice with sufficient time "to make a reasonable investigation and adequately protect its interest and that of the insured." *Lusch v. Aetna Cas. & Surety Co.*, 272 Or. 593, 599 (1975).

Columbia Knoll provided notice of a loss to GAIC on October 31, 2016. GAIC argues that this does not constitute prompt notice because Columbia Knoll discovered water intrusion and damage in 2005 and 2010. GAIC argues it was prejudiced because "destructive testing and repairs were performed before GAIC had a chance to observe and evaluate the damage." GAIC Mot. 16. Additionally, had it learned of these defects and the ongoing damage, it likely would have non-renewed the policy.

Columbia Knoll argues that notice was, in fact, prompt. While it learned of certain water damage in 2010, it also believed that this damage was successfully remediated. It did not learn of the hidden damage at issue here until destructive testing occurred in June 2016. Specifically, while Columbia Knoll "notified its building contractor, Synergy, about alleged defects in its buildings on May 26," it was not aware of damage related to those defects until it performed testing less than a month later. Resp. to GAIC Mot. Summary Judgment 10 ("Resp. to GAIC"), ECF 94. Columbia Knoll then reported that damage to GAIC in October 2016.

The Court cannot find that summary judgment is appropriate on these grounds. First, as to prejudice, GAIC offers no argument as to *how* or *why* the destructive testing or alleged repairs[12] affected its ability to perform a reasonable investigation. While GAIC points out that one witness acknowledged that "conditions at the building were different after the destructive testing than before the destructive testing," the Court cannot conclude, without further argument, that vague, unexplained "differences" may have prejudiced GAIC by inhibiting its investigation. Indeed, as Columbia Knoll points out, GAIC did not perform any destructive testing, and GAIC's own experts have not "raised any complaint or suggested any unfair prejudice arising from the June 2016 testing." Resp. to GAIC 10 n.34.[13]

Moreover, the Court cannot find, as a matter of law, that Columbia Knoll did not provide notice within a reasonable period of time. As an initial matter, summary judgment is "generally an inappropriate way to decide questions of reasonableness because 'the jury's unique competence in applying the "reasonable man" standard is thought ordinarily to preclude summary judgment.'" *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (quoting *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994)). Summary judgment on questions of reasonableness is appropriate "when only one conclusion about the conduct's reasonableness is possible." *Id.* Columbia Knoll has offered evidence that it believed the defects and damages discovered in 2010 were repaired. *See* Miller Decl. ¶ 2, ECF 96. Columbia Knoll also alleges that it did not discover the specific damage at issue until it performed destructive testing in June 2016. *Id.* Whether Columbia Knoll acted reasonably in

---

[12] Other than emergency repairs to a flat roof section of one building at The Terraces, Houser Decl. Ex. II at 1, GAIC offers no evidence of any other repairs. Neither party explains what, exactly, this "emergency repair" consisted of or how it might have impacted GAIC's ability to investigate the damage at issue.

[13] GAIC also offers no legal support for its speculative argument that it suffered prejudice because it would not have renewed the policy sooner if it knew of the damage. The argument also ignores Columbia Knoll's position that it did not learn of the damage at issue until 2016.

failing to provide notice until October 2016—five months after it notified the building contractor of defects and four months after it performed destructive testing—remains a question for the jury.[14] Summary judgment is therefore denied.

### iii.  Two-Year Suit Limitation Provision

Under Oregon law, all fire insurance policies must contain the following provision: "[n]o suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 24 months next after inception of the loss." O.R.S. § 742.240.[15] Oregon courts, focused on the phrase "inception of the loss," have concluded that this statutory language does not provide for a "discovery rule"—that is, regardless of when the damage is discovered, suits must be brought within two years of the date the damage actually occurred. *Moore v. Mutual of Enumclaw Ins. Co.*, 317 Or. 235, 250 (1993).

The GAIC policy does not recite the statutory language verbatim. Instead, the policy provides that any legal action must be "brought within 2 years after the date on which the direct physical loss or damage occurred." GAIC Policy at 33. According to GAIC, this provision differs only slightly from the statutory provision. Thus, GAIC argues that there is no discovery rule, and Columbia Knoll's claims fall outside of the two-year statute of limitations provided by the policy itself.

---

[14] Additionally, GAIC's argument that "Columbia Knoll's settlement of its $8 million lawsuit against Synergy for only $400,000 is a clear indication that Columbia Knoll knew that it could not prove that the 2010 repairs cured all of the original construction defects and that its claims were barred by the 10-year statute of limitations for construction defects against the original builder" is speculative at best.

[15] Oregon law allows an insurer to substitute "corresponding provisions of different wording" that are "not less favorable" than the statutory provisions (with the approval of the Director of the Department of Consumer and Business Services). O.R.S. § 742.021. Neither party has argued that GAIC policy impermissibly omitted the statutory provision.

Judge Beckerman recently examined an identical policy provision in *Housing Northwest Inc. v. American Insurance Co.*, 3:19-cv-00253-SB, 2019 WL 7040922 (D. Or. December 20, 2019). In the context of hidden and progressive water damage, Judge Beckerman found that the policy term "occurred" was ambiguous. *Id.* at *3. It could mean "'to present itself,' to 'appear,' or to 'exist,' so that the limitations period is not triggered until after the loss or damage presents itself or appears or ceases to exist." *Id.* It could also mean "the date on which the damage begins." *Id.* After looking for a contextual answer, Judge Beckerman relied on differences between the statutory language and the policy language, and construed the policy in favor of the insured:

> First, any insurance company selling property insurance in Oregon should be aware that progressive water damage is a common occurrence, and should be motivated to draft clear policy language to govern coverage of such damage. Second, insurance companies have been litigating this same policy language in Oregon for over one hundred years, and Defendants were on notice regarding the ambiguity of the term "occurred" in this context. *See, e.g.*, *Egan v. Oakland Home Ins. Co.*, 29 Or. 403, 405 (1895) (discussing the interpretation of suit limitation provisions that begin to run from "the time the fire shall have occurred" from those that begin to run from the time "the loss or damage shall have occurred" or "after the loss," and citing cases from throughout the 1800s). Third, the relevant Oregon statute (OR. REV. STAT. § 742.240) provides clear language requiring an insured to commence an action "within 24 months next after inception of the loss," but Defendants chose not to incorporate the statutory language in their policies. For these reasons, the Court finds that the longstanding rule of interpretation against the drafter is fairly applied here.

*Id.* at *4.

The Court is persuaded by Judge Beckerman's analysis and adopts it here.[16] There is a meaningful difference between the statutory language and the policy language. Accordingly, the

---

[16] The Court also notes that GAIC's case citations are unpersuasive in this particular context. Many of these cases analyze only the statutory language, rather than the policy provision at issue here. For those cases in which court analyzed the policy provision at issue here, *see e.g. Harrington v. Am. Econ. Ins.* Co., 131 F. App'x 573 (9th Cir. 2005) (an unpublished Ninth Circuit case from 2005), the Court sees no argument from the parties as to whether the

Court finds that the two-year suit limitation provision was not triggered until Columbia Knoll

discovered the hidden damage. When that discovery actually occurred is a question of fact.

Summary judgment on this issue is therefore denied.

### iv. Exclusions Form

Next, GAIC argues that it is entitled to a declaration that the first policy issued to

Columbia Knoll, effective from June 30, 2011 through June 30, 2012, included the "Causes of

Loss" exclusion form. GAIC argues that, by mutual mistake, the form was not attached to the

June 30, 2011 policy. According to GAIC, while the parties agreed to the provisions in this form,

"[w]hen the policy was issued, a computer error occurred and the form did not get attached to the

policy." GAIC Mot. 21 (quoting Houser Decl. Ex. PP at 18:4-6). Nevertheless, the policy was in

fact endorsed "during the June 30, 2011 to June 30, 2012 policy period to include the missing

Causes of Loss form." *Id.* Specifically, Columbia Knoll's "insurance broker, Propel, received a

copy of the endorsement on August 29, 2011 via email[, and] Propel's typical business practice

when it receives an endorsement . . . would be to send the endorsement to the insured." *Id.*

GAIC first argues that because "[e]ach of the elements of reformation is present," the

Court should order the policy "reformed" under Oregon law to include the Causes of Loss form.

GAIC Mot. 22. In response, Columbia Knoll points out that, in amending its complaint, GAIC

discarded its standalone reformation claim, and instead asked only for a declaratory judgment.

Thus, Columbia Knoll argues that GAIC abandoned the claim. GAIC appears to concede this

point in its reply, arguing instead that

> [t]he first GAIC policy, from June 30, 2011 to June 30, 2012 ("the First GAIC
> Policy"), *need not be reformed* to include the "Causes of Loss" form because the
> First GAIC Policy was endorsed during the policy period—on August 23, 2011—
> to include the missing "Causes of Loss" form.

provision's language was in fact distinguishable from the statutory language or whether the
terms were ambiguous.

GAIC Reply 14, ECF 104 (emphasis added).

In other words, while GAIC first argues the Court should "reform" the policy, it then argues that reformation is not necessary due to the form's inclusion by endorsement. GAIC offers no explanation for this change of position. It also offers no explanation or citation in support of this position. Indeed, the Court sees *no* citation to any legal authority in this section at all. The Court will not attempt to flesh out legal arguments that GAIC failed to make. Thus, on this record, without any legal citation or explanation of the relevant endorsement analysis, the Court cannot find that GAIC has shown that the "Cause of Loss" form was included in the first GAIC policy.

### v.   Collapse

GAIC argues that there has been no "collapse" as defined in the GAIC policy. As discussed above, the Court agrees that Columbia Knoll has not identified any evidence that a collapse, as defined by policy, occurred during the relevant period. GAIC is therefore entitled to summary judgment on this issue.

### vi.   Remaining Exclusions

GAIC argues that the (1) defective construction exclusion,[17] (2) water seepage for more than fourteen days exclusion, and (3) "fungus," wet or dry rot, and bacteria exclusion also bar

---

[17] The "defective construction" exclusion provides that GAIC will not pay for loss or damage resulting from:

  c. Faulty, inadequate or defective:
      (1) Planning, zoning, development, surveying, siting;
      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
      (3) Materials used in repair, construction, renovation or remodeling; or
      (4) Maintenance[.]

GAIC Policy at 7.

coverage in this case. In response, Columbia Knoll argues that there is an outstanding question as to whether, or to what extent, the loss was caused by these excluded conditions or by "weather conditions," a covered peril.

The first question is whether Columbia Knoll has identified a covered peril. GAIC does not dispute the general premise that "weather conditions" are a covered peril.[18] Instead, GAIC appears to argue that *rain* is not a covered peril because it is not a "fortuitous" event.

According to GAIC, under an all-risk policy, covered perils must be "fortuitous." *See Market Place N. Condo. Ass'n v. Affiliated FM Ins. Co.*, No. C17-625 RSM, 2018 WL 2095733, *3 (W.D. Wash May 7, 2018) ("a loss which was certain to occur cannot be considered fortuitous, and may not serve as the basis for recovery under an all-risk insurance policy"). The Court is not convinced. While GAIC relies on Washington case law, it provides no evidence that *Oregon* law also requires proof of "fortuity."[19] To the contrary, Oregon law requires that "every contract of insurance shall be construed according to the terms and conditions of the policy," O.R.S. § 742.016(1), and GAIC has not identified any fortuity requirement in the policy at issue here. *See Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F Supp 259, 263 (D. Or. 1990) (dismissing insurer's argument that, under an all risk policy, it need only show a "fortuitous loss" because "an 'all risk' policy is still subject to express exclusions."). Moreover, even if the Court followed the cited Washington law, while rain may have been foreseeable,

---

[18] The GAIC policy excludes loss due to weather conditions under circumstances not relevant to this case. *See* GAIC Policy at 7.

[19] GAIC cites *Fox v. Country Mut. Ins. Co.*, 327 Or. 500, 509 (1998) for its position that "[t]he Oregon Supreme Court has recognized 'the familiar requirement that a loss be fortuitous' in order to constitute a covered loss." GAIC Mot. 36 n.153. In *Fox*, a motorist intentionally drove his vehicle off the road, killing his passenger. 327 Or. at 502–03. The court did not insert a blanket requirement that all losses covered under an insurance contract must be fortuitous. Instead, the court examined specific fortuity requirements (covered injuries must be "caused by an accident") that expressly appeared in the applicable statute and the policy itself. This case does not speak to any general requirement of "fortuity" as envisioned by GAIC.

GAIC offers no argument or evidence to support its position that the *loss*—i.e., the damage from the rain, not the rain itself—was reasonably foreseeable. *See Sunwood Condo. Ass'n v. Travelers Cas. Ins. Co. of Am.*, No. C16-1012-JCC, 2017 WL 5499809, \*3 (W.D. Wash. Nov. 16, 2017) ("The proper inquiry is not whether the rain is unexpected, but whether the loss is unexpected. NSC's policy contains no exclusion for rain, and NSC cannot create one with a fortuitousness argument." (citations omitted)).

GAIC's reliance on *Vision One* in its reply is similarly unpersuasive. In that Washington case, the court wrote that "in insurance parlance, '"perils" . . . refers to fortuitous, active, physical forces such as lightening, wind, and explosion which bring about the loss.'" *Vision One LLC v. Philadelphia Indem. Ins. Co.*, 276 P.3d 300, 306 (Wash. 2012) (quoting *Garvey v. State Farm Fire & Cas. Co.*, 770 P.2d 704 (Cal. 1989)) (alterations in original).  Importing this language, GAIC argues that "ubiquitous wind-driven rain in the Pacific Northwest" is not "fortuitous, absent a discrete, unusual and sudden storm event." GAIC Reply 12. GAIC fails to offer any citation, argument, or support for its position that a "fortuitous event" is a "discrete, unusual, and sudden event." GAIC also fails to point the Court toward any provision in the policy that would support its position. The Court is therefore not convinced that rain is not a "peril" under an all risk policy or that it is necessarily an excluded condition under the terms of this policy.

Because rain is a covered peril, the next question is whether the loss was caused by rain or by an excluded peril. When there are multiple causes for a single loss, "the 'efficient proximate cause' is the relevant cause for determining coverage under an insurance contract." *Naumes, Inc. v. Landmark Ins. Co.*, 119 Or. App. 79, 82 (1993) (citation omitted).

> The "efficient proximate cause" of a loss is the active and efficient cause that sets
> in motion a train of events which bring about a result without the intervention of

> any force, starting and working actively and efficiently from a new and
> independent source.

*Id.* (citation omitted). "Generally, if the facts are disputed, or different inferences may be drawn from undisputed facts, the question of the 'efficient proximate cause' of a loss is for the jury." *Id.* at 82–83. Thus, if weather conditions—i.e., rain—are the efficient proximate cause of Columbia Knoll's loss, "then all of the subsequent, intervening perils excluded by [GAIC's] policy cannot negate coverage for the 'entire loss' at issue here." Resp. to Phil. 21. If one of the *excluded* perils—e.g., defective construction, water seepage for more than fourteen days, or fungus/dry rot—is the efficient proximate cause, however, GAIC is not liable.

Judge Jelderks examined a very similar issue in *Point Triumph Condominium Ass'n v. American Guarantee and Liability Insurance Co.*, No. 99-1504-JE, 2000 WL 34474454 (D. Or. Dec. 29, 2000). In that case, water began penetrating the siding on condominium buildings near the Oregon coast. *Id.* at *1. Plaintiff, the buildings' owner, first brought a successful warranty claim against the siding manufacturer. *Id.* Plaintiff then brought a claim against the insurer, arguing the buildings had been damaged "as a result of weather." *Id.* The insurer denied the claim, asserting that defective siding, construction, and maintenance had instead caused the loss. *Id.* at *2, *5.

Judge Jelderks first confirmed that expert reports "link[ed] the damages to plaintiff's buildings to either failure of the siding or to improper construction and maintenance." *Id.* at *5. After examining the relevant Oregon cases, he then relied on two Ninth Circuit cases in which the court found that a contractor's failure to cover exposed premises was the "efficient proximate cause" of damage that occurred after rain. *Id.* at *6. He concluded:

> Plaintiff's loss here was caused by moisture penetrating the siding and
> substructure of several of plaintiff's buildings. Wind-driven rain, a peril covered
> by the policy, is a common phenomenon on the Oregon Coast, and there is no

evidence in the record that it would have damaged plaintiff's buildings in the absence of defects in material or inadequacies in construction or maintenance that are specifically excluded under the policy. The damage to plaintiff's buildings was not a "natural" direct or indirect consequence of the rain, but instead was an abnormal occurrence that would not occur in the absence of other conditions—the faulty material, construction, or maintenance established by the record—that were specifically excluded from coverage under the policy. Under these circumstances, as in *Smith* and *Tento*, rain may have "operated more immediately" than other factors in producing the loss. Like the failure to cover exposed property in those actions, use of defective siding, or improper construction or maintenance here "set in motion" the chain of events leading to the loss. Here, as in those decisions, the rain cannot be characterized as the "dominant" or "most important" cause of loss. Accordingly, a trier of fact could not conclude that wind-driven rain constituted the efficient proximate cause.

*Id.* at *6.

Here, Columbia Knoll identifies no disputed facts; the parties appear to agree that defects in construction allowed rain to damage the buildings. Instead, Columbia Knoll relies on a number of Washington cases, applying Washington law, to argue that because rain "caused ongoing, repeated instances of water-intrusion damages," a jury could determine that rain was the proximate efficient cause of the damage. Resp. to Phil. 25.

The Court does not agree. First, by Columbia Knoll's reasoning, all rain damage claims would survive summary judgment on the issue of proximate cause. Yet the Ninth Circuit has found that these questions may, in fact, be resolved on summary judgment. *See, e.g.*, *Tento Int'l Inc. v. State Farm Fire and Casualty Co.*, 222 F.3d 660 (9th Cir. 2000). Second, while Columbia Knolls relies heavily on Washington case law, Columbia Knoll has not demonstrated that the Oregon and Washington proximate cause rules are, in fact, "virtually indistinguishable." *See* Resp. to Phil. 22. Rather, instead of argument or analysis, Columbia Knoll simply asks the Court to "compare" four cases discussing the different rules. *See id.* Finally, to the extent the cited cases remain persuasive, the Court sees only support for the undisputed proposition that, as a general matter, questions of proximate cause should be left for the jury when there are disputes

of fact or diverging inferences to be drawn from those facts. *See, e.g.*, *Greenlake Condo. Ass'n v. Allstate Ins. Co.*, No. C14-1860 BJR, 2015 WL 11988945 (W.D. Wash. Dec. 23, 2015) (applying Washington case law and finding, without further analysis, that "while there is agreement as to the range of possible [efficient proximate causes] of the loss, the actual EPC is disputed. To the extent that Plaintiff seeks summary judgment as to the proximate cause of damage, this question is a question of fact best left to a jury.").

Here, with no disputes of fact, the Court remains persuaded by Judge Jelderk's reasoning in *Point Triumph*. Columbia Knoll's attempt to distinguish *Point Triumph* is unavailing. Columbia Knoll argues only that Judge Jelderks relied on Ninth Circuit cases applying California law. According to Columbia Knoll, California law differs from Oregon law in that, under Oregon law, there is no requirement that the multiple or distinct perils independently cause damage. The Court does not agree. Columbia Knoll offers no citation to Oregon law for this position. Although somewhat unclear, the Court also notes that the *Naumes* court wrote:

> The efficient proximate cause of a loss is the active and efficient cause that sets in motion a train of events *which bring about a result without the intervention of any force*, starting and working actively and efficiently from a *new and independent source.*

119 Or. App. at 82 (citations and quotation marks omitted) (emphasis added). The Court therefore sees no error in Judge Jelderks's reasoning or reliance on two Ninth Circuit cases applying California law.

In sum, like in *Point Triumph*, Columbia Knoll cites "no evidence in the record that would support the conclusion that the losses of which it complains were not the result . . . of problems with installation or maintenance that are subject to the 'faulty, inadequate, or defective' exclusion." 2000 WL 34474454 at *5. There is no evidence of any particularly severe rainstorm or that any of the damage would have occurred in the absence of "faulty, inadequate or

defective" construction. *Id.* Thus, the Court finds that here, like in *Point Triumph*, the rain cannot

be characterized as the "dominant" or "most important" cause of loss. Accordingly, a trier of fact

could not conclude that wind-driven rain constituted the efficient proximate cause.[20] Summary

judgment is therefore granted on this issue.

### vii. Breach of Contract Counterclaim

Finally, GAIC argues it is entitled to summary judgment on Columbia Knoll's Breach of

Contract counterclaim because Columbia Knoll's loss is not covered by GAIC policies for the

reasons stated above, and because Columbia Knoll has not identified any expert who will testify

to damages. GAIC provides no argument or citation to support its position that an expert is

necessary to prove damages—i.e., the cost of repairs—here. To the extent summary judgment on

this claim is consistent with the rulings set for the above, the motion is granted. To the extent it is

not, the argument is insufficiently developed at this time.

### c. Philadelphia's Motion for Summary Judgment

Philadelphia raises four primary arguments in its motion for summary judgment: (1)

Columbia Knoll cannot show that a covered collapse "commenced" during the policy period at

issue; (2) damage from long term water intrusion is not covered by the Philadelphia policies; (3)

policy exclusions bar recovery for all damage, and (4) the known loss doctrine bars recovery for

all damage.

### i. Collapse

Philadelphia argues that Columbia Knoll cannot prove that a covered collapse

commenced during a policy period. Like GAIC, Philadelphia defines collapse as "an abrupt

falling down or caving in of a 'building' or any part of a 'building' with the result that the

---

[20] Because the Court finds that no trier of fact could conclude that wind-driven rain was the
efficient proximate cause of Columbia Knoll's loss, the Court need not reach the parties'
arguments about the remaining exclusions.

'building' or part of the 'building' cannot be occupied for its intended purpose." Philadelphia

Policy at 53. For the reasons stated above, Columbia Knoll has not identified any evidence of a

covered collapse. To the extent Columbia Knoll's experts rely on Martin's definition of collapse,

the testimony is excluded. Even with this testimony, Columbia Knoll has failed to identify any

specific, identifiable instance of collapse, as defined by policy, that occurred during the

Philadelphia policy period. Summary judgment is therefore warranted.

### ii.  Long-Term Water Intrusion

Philadelphia also argues that its policy does not cover non-collapse damages caused by

"long term water intrusion." Philadelphia Mot. for Summary Judgment ("Phil. Mot.") at 22, ECF

85. This argument relies on two policy provisions tangentially related to water damage and

generalizations about perils covered by all risk policies.

### 1.  Policy Provisions

 Philadelphia argues that its policy, construed as a whole, does not provide coverage for

long-term water intrusion. Philadelphia does not identify any provision expressly excluding

coverage for long-term water intrusion. Instead, Philadelphia appears to argue that two policy

provisions, when read together, suggest that only water damage caused by specific, catastrophic

events is covered. The first provision states that water damage, defined as the "accidental

discharge or leakage of water or steam as the direct result of the breaking or cracking of any part

of a system or appliance containing water or steam," is a covered loss. Philadelphia Policy at 49.

The second states that Philadelphia will not pay for loss to:

> c. The interior of any "buildings", or to personal property in "buildings", caused
> by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind
> or not, unless:

> (1) The "buildings" first sustain damage by a Covered Cause of Loss to their roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or
>
> (2) The "loss" is caused by or results from thawing of snow, sleet or ice on the "buildings".

*Id.* at 48.

Neither provision is relevant to the damage alleged here. The first provision does not speak to or exclude damage from rain. As to the second provision, Columbia Knoll does not claim damage to the interior of any building or to personal property within a building. Rather, the damages "concern decks, exterior walls, and framing." Resp. to Phil. 19.

To the extent Philadelphia argues that, taken together, these provisions (as well as exclusions for "faulty workmanship, wear, tear, decay and deterioration, and the continuous seepage exclusion") show that "the policies are not intended to cover long term water intrusion," Phil. Mot. 24, the Court is not persuaded that such broad inferences are appropriate. While Philadelphia may argue that specific damage is excluded under specific provisions and exclusions, as it has done below, the Court will not infer, as a general matter, that the insurer "intended" to exclude "long term water intrusion" when no such explicit provision exists. If Philadelphia had intended to include such an exclusion, it certainly could have done so. *See N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29 (2001) ("It is the insurer's burden to draft exclusions and limitations that are clear."); *Nw. Agr. Co-op. Ass'n, Inc. v. Cont'l Ins. Co.*, 95 Or. App. 285, 289 (1989) (refusing to read a "collision" exclusion into a policy that was not explicitly part of the policy, and holding that "[i]f defendant intended to exclude from its specified perils coverage losses caused by collision, it could have done so easily."). This argument is therefore without merit.

34 – OPINION & ORDER

### 2. All Risk Policies

Like GAIC, Philadelphia does not contest that its policy is an all-risk or open peril policy. Instead, relying on *Vision One*, it appears to argue that long-term exposure to rain and weather conditions is not a covered peril under all risk policies generally. *See Vision One*, 276 P.3d at 306 ("In insurance parlance, "'perils'" . . . refers to fortuitous, active, physical forces such as lightening, wind, and explosion which bring about the loss.'").

The Court is not persuaded. As stated above, Philadelphia provides no evidence that Oregon law or its policy requires proof of a "fortuitous, active, physical force." Thus, to the extent Philadelphia argues that "[l]ong term exposure to rain and weather conditions is not a fortuitous, active physical force," or that a fortuitous, active physical force is an "extraordinary weather event, such as a tornado or hurricane," the argument is irrelevant and unsupported. To the extent Philadelphia raises additional arguments (e.g., "the terms of the Philadelphia policies do not support characterizing 'rain' or 'water damage' as a separate peril," Phil. Reply 11), these arguments are again devoid of any supporting legal analysis or citation. Without further analysis or citation, Philadelphia's argument that long-term exposure to rain and weather conditions is not a covered peril is therefore insufficiently developed at this time.

### iii. Exclusions

Philadelphia, like GAIC, argues that the exclusions here—faulty workmanship,[21] wear and tear, deterioration and decay, and continuous water seepage—bar coverage. Columbia Knoll

---

[21] Specifically, the policy provides that Philadelphia will not pay for loss resulting from:

> c. Faulty, inadequate or defective:
>   (1) Planning, zoning, development, surveying, siting;
>   (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
>   (3) Materials used in repair, construction, renovation or remodeling; or
>   (4) Maintenance[.]

again argues there is a question of fact as to whether a covered peril (rain) or an excluded condition is the proximate cause of the loss. For the reasons stated above, no reasonable jury would conclude that rain, rather than faulty workmanship, was the proximate cause of the damage at issue. Summary judgment is therefore granted.

### iv.   Known Loss Doctrine

Lastly, Philadelphia argues that, under the known loss doctrine, Columbia Knoll cannot recover for damages because "Columbia Knoll knew that the buildings were in a state of substantial decay prior to the issuance of the first Philadelphia policy on June 30, 2014." Phil. Mot. 29. The "known loss" doctrine bars coverage "where the loss to be insured is in progress or substantially likely to occur when the insurance contract is issued." *Malbco*, 629 F.Supp.2d at 1200–01 (quoting *City of Corvallis v. Hartford Acc. & Indem. Co.*, 1991 WL 523876, *8 (D. Or. May 30, 1991)). It is unclear whether the known loss doctrine applies under Oregon law. If it does apply, both the Ninth Circuit and *Malbco* court suggest that "it is likely that Oregon courts would align themselves with those jurisdictions which only allow use of the 'known loss' doctrine to invalidate coverage where the insurer shows that the insured fraudulently misrepresented or concealed a material fact." *Id.* at 1201; *Generali-U.S. Branch v. Bank of Montreal*, 46 F.3d 1141 (9th Cir. 1995) (Table). As discussed above, there is a question of fact as to whether Columbia Knoll knew of the loss when the policy was issued. Columbia Knoll submits evidence that it believed the damage identified in 2010 was successfully repaired. It also argues there is no evidence that it knew of the specific, hidden damage that occurred during the policy period at issue. Additionally, Philadelphia provides no evidence that Columbia Knoll

---

Philadelphia Policy at 43.

fraudulently misrepresented or concealed any material facts. Summary judgment on this issue is therefore denied.

## CONCLUSION

For the reasons stated above, the motions for summary judgment [85][87] are granted in part and denied in part. The motion to exclude [84] is granted in part and denied in part. The motion to strike [109] is denied.

Dated: _____ September 4, 2020 _____.

_____

MARCO A. HERNÁNDEZ
United States District Judge